**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA**

        **Plaintiff,**

  **v.**

                              **Civil Action 2:13-cv-1048**

                              **Chief Magistrate Judge Elizabeth P. Deavers**

**REAL PROPERTY KNOWN AND**
**NUMBERED AS 10338 MARCY ROAD**
**NORTHWEST, CANAL WINCHESTER,**
**OHIO,**

        **Defendant,**

**LEVI H. WINSTON,**

        **Claimant.**

## OPINION AND ORDER

Plaintiff, the United States of America (the "United States"), brings this civil action *in rem* for forfeiture of the real property known and numbered as 10338 Marcy Road Northwest, Canal Winchester, Ohio (the "Property") under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 21 U.S.C. § 881. Specifically, the United States alleges the Property was used or intended to be used in exchange for controlled substances, or represents proceeds of trafficking in controlled substances, or was used or intended to be used to facilitate the trafficking of a controlled substance and is therefore forfeitable. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355. Venue is proper in this district under 28 U.S.C. §§ 1355(b)(1)(A) and 1395. This matter came before the Court for a bench trial in March 2017. The Court, via this Opinion and Order, issues its findings of fact and conclusions of law pursuant

to Federal Rule of Civil Procedure 52(a).  For the reasons set forth below, the Court concludes that the government has successfully shown by a preponderance of evidence that the Property is subject to forfeiture.

## I.  BACKGROUND

On April 11, 2013, Claimant Levi H. Winston ("Winston") was charged by Information in this Court in criminal case number 2:13-cr-92 with one count of conspiracy to possess with intent to distribute 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 856, and one count of money laundering concealment, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  (Joint Exhibit ("JE")-I.)  Winston subsequently entered a guilty plea to both counts of the Information.  (JE-J.) At Winston's plea hearing on May 2, 2013, the statement of facts read into the record.  Winston acknowledged under oath that the statement of facts was correct.[1]  The facts established that between May 2010 and March 8, 2013, Winston arranged for multiple shipments of marijuana to Columbus.  (JE-M, at 27-28.)  Winston and an associate, Steven Johnson ("Johnson"), rented warehouses where the marijuana shipments were delivered and stored.  Winston also purchased a van with $6,875 of narcotics trafficking proceeds in September 2013.  Thus, Winston knowingly, willfully, and unlawfully conspired to possess with intent to distribute at least 1,000 kilograms of marijuana throughout Central Ohio.  On October 31, 2013, this Court entered judgment against Winston for both counts contained in the Information and sentenced him to 135 months of incarceration.  (JE-L, JE-N.)

On October 24, 2013, the United States filed the instant forfeiture action.  (ECF No. 1; the "Complaint" or "Compl.")  Specifically, the Complaint alleges that Winston purchased the

---

[1] Later in the hearing, Winston objected as to the Government's statement of facts as to the start date for his involvement in the conspiracy.  The Court, however, overruled the objection.  This issue is not relevant to the forfeiture claim in this case.  (JE-N, at 11-13.)

Property from Robin Adams ("Adams"), the record owner, who had not yet transferred the deed. (*Id*. ¶ 5.) The Property is mortgage free and is valued approximately at $53,000. (*Id*. ¶¶ 6-7.) The United States further alleged that the Property is forfeitable because it was "used or intended to be used in exchange for controlled substances, or represents proceeds of trafficking in controlled substances, or was used or intended to be used to facilitate the trafficking of a controlled substance," in violation of 21 C.F.R. § 1300.01. (*Id*. ¶ 9.) As a result, the United States claimed that the Property is forfeitable under 21 U.S.C. § 881(a)(6). (*Id*. at 5.) On January 8, 2014, Winston filed a Verified Claim and Answer, asserting that he had an interest in the Property and denied the allegations in the Complaint that it had been purchased with money connected to illegal activity. (ECF Nos. 7, 8.) Adams did not file a claim or answer and the Court accordingly entered an Entry of Default against him on January 22, 2014. (ECF No. 13.)

The United States filed a motion for summary judgment on November 21, 2014, in which the United States argued that the record reflected no genuine issue of material fact with respect to the Property having been purchased from drug sale proceeds (a "proceeds theory"). This Court subsequently granted summary judgment in favor of the United States on May 27, 2015. (ECF Nos. 27, 38.) On June 19, 2015, Winston filed a timely notice of appeal. (ECF No. 40.) On August 9, 2016, the United States Court of Appeals for the Sixth Circuit reversed the Court's grant of summary judgment and remanded the case for further proceedings. *United States v. Real Property 10338 Marcy Road*, 659 F. App'x 212 (6th Cir. 2016) (hereinafter "*Marcy Road*"). Specifically, the Sixth Circuit held that, where the government seeks forfeiture under a "proceeds theory," the government must show a "substantial connection" between the property to be forfeited and illegal drug-trafficking activity. *Id*. at 216. The Sixth Circuit found that the

evidence proffered by the government at the summary judgment phase tying the money Winston used to purchase the Property to prior illegal activity was merely speculative. *Id*. at 218. As a result, "Winston [had] adduced sufficient facts to create a genuine dispute over whether the cash payments to Robin Adams for the property were connected to the sale of any controlled substance." *Id*. at 219.

Following additional discovery, this case came before the Court for a bench trial on March 1-2, 2017. (ECF Nos. 62-63.) The parties subsequently submitted post-trial briefing. (ECF Nos. 64 and 65.)

## II.    WITNESSES

### A.    United States

The government presented seven witnesses at trial. Each testified on March 1, 2017. The following is an *ad seriatim* summation of testimony relevant to the determination of the claim at issue, as well as general credibility determinations.

#### 1.    Ryan Marvich

Special Agent Ryan Marvich ("Agent Marvich") of the United States Department of Homeland Security, Investigations, testified that he has been with various federal law enforcement agencies for approximately 19 years and is currently assigned to a federal narcotics task force. (Tr. Vol. 1, 11:1-10.) Agent Marvich testified that, in November 2012, during the course of an investigation of marijuana being trafficked from Brownsville, Texas to Columbus, Ohio, a warehouse of marijuana was discovered in Columbus, Ohio. Several individuals were arrested who were at the warehouse and the property was found to have been rented by Winston. (*Id*. at 12:13-22.)

Agent Marvich further testified that he personally learned Winston "was involved with other individuals who were a part of a conspiracy to distribute a large amount of marijuana that was being brought into the United States from Mexico and being brought to the Columbus area and being distributed in the Columbus, Ohio, area." (*Id*. at 15:8-12.) Agent Marvich also learned that Winston, "through himself and through other individuals, rented warehouses in the Columbus area for the purpose of unloading marijuana, and that Mr. Winston also personally distributed some of the marijuana that was delivered in the Columbus area." (*Id*. at 15:13-17.) Winston was subsequently charged in a criminal complaint with conspiracy to possess with the intent to distribute over 1,000 kilograms of marijuana. (*Id*. at 15:22-23.)[2]

After Winston's guilty plea and resulting criminal conviction in relation to the marijuana investigation, Agent Marvich continued to stay involved in further investigatory efforts. (*Id*. at 20:4-6.) At that time, he testified, he learned that "Winston purchased the Defendant Property in this case for – I think it was $36,500 that was paid in cash to Mr. Robin Adams, and this property was purchased during the time that Mr. Winston was involved with the conspiracy to distribute the marijuana which he pled guilty to." (*Id*. at 20:15-20.)[3] Agent Marvich also testified that the investigation "never obtained any information or saw any evidence that Mr. Winston had any source of legitimate income." (*Id*. at 20:20-22.)

Under cross-examination, Agent Marvich testified that he participated in the execution of a search warrant in March 2013 for documents pertaining to the criminal investigation of

---

[2] Documentary evidence reflects that Winston pled guilty in this Court to the following two charges: (1) conspiracy to possess with the intent to distribute 1,000 kilograms or more of a substance containing a detectable amount of marijuana from May 2010 through December 31, 2012; and (2) money laundering, specifically, purchasing a vehicle with proceeds of the unlawful activity of conspiracy to distribute and possession with intent to distribute marijuana. (P-L.)

[3] Claimant stipulated that Agent Marvich learned about the Property transaction from Adams. (Tr. Vol. 1, 21:19-20.)

Winston with respect to "any properties he may have purchased, any other warehouses he may have rented, any storage lockers he may have rented, any paper document that would lead us to other locations where any other crimes would have been committed, as well as any cash."   (*Id*. at 23:15-19.)  Agent Marvich testified that Special Agent Barney Clark ("Agent Clark") from the Internal Revenue Service ("IRS") participated in the search in order to seize documents related to legitimate or illegitimate income.  (*Id*. at 23:20-24:7.)

The Court finds the testimony of Agent Marvich credible and accords it appropriate weight.

### 2.   Lisa Brown

Detective Lisa Brown ("Detective Brown") testified that she has been employed by the Franklin County Sheriff's Office since 1994.  Additionally, she has worked for the Special Investigations Unit, the HIDTA Task Force and, from 2014 to present, the FBI Violent Crimes Task Force.  (*Id*. at 29:23-30:8.)

Detective Brown further testified that, in mid-October 2011, she was assigned to surveil a warehouse in Columbus in connection with an investigation into a controlled delivery of approximately 17 to 18 hundred pounds of marijuana.  (*Id*. at 30:21-31:3.)  Several individuals were arrested as a result of the investigation at the warehouse, which, Detective Brown learned, was leased to Winston.  Detective Brown was subsequently tasked with interviewing Winston.  (*Id*. at 31:17-24.)  Detective Brown also observed Winston driving a white cargo van in the course of her investigation.  (*Id*. at 4-8.)

Through continuing investigation, Detective Brown testified, she learned that Winston had recently purchased a property at 999 Cummington.  (*Id*. at 32:9-10.)  Detective Brown

visited the 999 Cummington property where she learned that Winston had hired individuals to help refurbish portions of that and other properties, and paid for the work in cash. (*Id*. at 32:25-33:5.) Detective Brown testified that the remodel was "done very nicely. It was a higher-end . . . remodel. It was nice cabinets, had a very nice closet, California closet system, in it, some very nice fixtures." (*Id*. at 42:12-17.)

Finally, Detective Brown also learned, in the course of her investigation, that Winston was involved in renting multiple other warehouses, such as, Centerpoint Drive, Grove City in early 2012, Groveport Road, in the fall of 2012, and Westbelt Avenue or Road. (*Id*. at 37:16-38:2.) Detective Brown testified that she believes Winston rented the warehouses—or had someone else rent them for him—to utilize them in the delivery of marijuana. (*Id*. at 40:13-22.)

The Court finds the testimony of Detective Brown generally credible. The Court, however, discounts her opinion testimony regarding the remodel of the 999 Cummington property as it is highly subjective and, therefore, accords it little weight.

### 3. Steven Johnson

Steven Johnson ("Johnson") testified that, after he met Winston through mutual friends at a car lot, they pursued a business relationship. (*Id*. at 52:8; 22-24; 55:6-9.) The business relationship consisted of Johnson renting forklifts, a crane, warehouses and unloading a box off a truck with the forklifts for Winston. (*Id*. at 52:10; 19-20; 53:1-2.) Johnson testified that he rented the warehouses under his business' name, entitled JF Industries, for Winston with money Winston gave to him. (*Id*. at 53:3-15.) Johnson further testified that Winston paid him to rent the warehouses in cash, erratically, in amounts that totaled about $25,000 in a year's time. (*Id*. at 54:5-10; 57:22.) Johnson testified that he would take the cash given to him by Winston and use

it to pay the warehouse rental fees via a cashier's check drawn in JF Industries' name. (*Id*. at 58:2-4.) Johnson testified that he rented three warehouses in total for Winston—one on Westbelt in Groveport, one on Centerpoint Drive, and one on Groveport Road. (*Id*. at 61:17-18; 65:1-3; 71:14-15.)

Johnson also testified that he was pulled over and arrested while driving a truck in February 2013 from Texas to Columbus. Johnson testified that law enforcement found 600 pounds of marijuana in the truck upon inspection. (*Id*. at 82:23; 83:16-23.) As a result of the incident, Johnson was charged and convicted of distribution of marijuana. (*Id*. at 84:23-85:2.) Johnson finally testified that the purchase price for marijuana from Texas is about $500 per pound, while the street resale value would be $800-1000 per pound. (*Id*. at 85:11-12; 86:9-12.)

The Court finds the testimony of Johnson credible and accords it appropriate weight.

### 4. Robin L. Adams

Robin L. Adams ("Adams") testified that he is currently a dump truck driver. (*Id*. at 92:17.) In 2009, Adams testified, he was charged with and pleaded guilty to conspiracy and drug trafficking. (*Id*. at 93:25-93:3.) Adams testified that he has completed his sentence. (*Id*. at 93:9-11.)

Adams testified that he is the prior owner of the Property, which he purchased sometime around 2004. (*Id*. at 93:12-17.) Adams described meeting Winston in 2012 through mutual contacts after Adams decided to try to sell the Property. (94:23-95:7.) On November 29, 2012, Adams and Winston executed a Contract for Deed (the "Contract"), under the terms of which Winston agreed to purchase the Property for a price of $36,500. (*Id*. at 96:13-15; JE-A.) Winston paid Adams a down payment of $14,500, and Adams subsequently created a payment

ledger in order to record amounts paid and due.  (*Id*. at 97:16-23; JE-A; JE-B.)  In addition to the

$14,500 down payment, the ledger indicates that Winston paid Adams $1,000 on December 11,

2012; $1000 on December 12, 2012; and $10,000 on January 2, 2012.  Despite the reflection on

the payment ledger of $10,000 still outstanding, Adams testified that he and Winston agreed

Winston had paid in full for the Property.  Specifically, when Winston "got into this trouble that

he was in, this case here he was in" Adams told him he owed nothing more.[4]  (*Id*. at 99:17-25.)

Adams testified that he considered the sale of the Property to be complete to which end, he

would be willing to sign a quitclaim deed over to Winston in order to complete the transaction.

(*Id*. at 100:2-4, 16-17.)

The Court finds the testimony of Adams generally credible and accords it appropriate

weight.

### 5.    Floyd Sims

Floyd Sims ("Sims") testified that he met Winston when both men were serving prison

sentences in McKean Federal Prison in Pennsylvania ("McKean").  (*Id*. at 103:17-18.)  Sims

testified that he next saw Winston after the latter was released from prison around 2009.  (*Id*. at

103:25-104:2.)  Sims recalled that Winston said he was working at a call center while he was in

the halfway house.  (*Id*. at 105:5-8.)  Over the next few years, Sims testified, he and Winston

bought and sold each other drugs three or four times.  (*Id*. at 105:19-22.)

Sims testified that when he was released from prison in 2009, Winston approached him

and asked "to borrow $15,000 so that [Winston] could hire a lawyer to fight to keep his land."

(*Id*. at 106:9-12.)  Sims testified that he did not make the loan to Winston because he did not

---

[4] Thus, Winston paid Adams $26,500 for the Property.

have any money. (*Id*. at 106:13-14.) Sims acknowledged that he was not sure what land Winston was referring to, only that "the feds were trying to take it from him."[5] (*Id*. at 106:17.)

While he was unsure of what land "the feds were trying to take," Sims later testified that he did know about Winston's "other properties." (*Id*. at 110:4-5.) Sims testified that Winston had purchased a half-double as an investment property. (*Id*. at 110:7-8.) Sims averred that Winston told him that "he had saved his money up from his job [at the telemarking customer service call center] to buy that place" and that he intended to fix it up in order to rent it out. (*Id*. at 110:12-19; 21-22.) Finally, Sims also testified that he introduced Johnson and Winston after the latter told Sims he was looking for someone to rent a warehouse for him. (*Id*. at 107:6-12.)

The Court finds the testimony of Sims to be only partially credible. In addition to the hearsay issues with respect to Sims' testimony regarding things Winston said to him,[6] Sims' testimony regarding Winston's request for a $15,000 loan to "keep his land" from the "feds," in 2009 is inconsistent with the facts of the case which reveal that the Government did not seek forfeiture of the property—or indeed initiate the underlying criminal proceedings—until several years later. Finally, the Court observed the witness's demeanor and finds that Mr. Sims did not display significant indicia of trustworthiness. As a result, his testimony is accorded little weight.

### 6. Bernard Clark

Bernard Clark ("Clark") testified that he is a criminal investigator with the Internal Revenue Service ("IRS"), tasked with investigating money laundering and tax crimes. (*Id*. at 117:25-118:5.) Clark has been employed by the IRS for 32 years, with the last 20 being assigned

---

[5] Notably, Sims' first meeting with Winston was in 2009, four (4) years earlier than when the Government instituted the forfeiture action on October 24, 2013.

[6] The Sixth Circuit has yet to rule on whether hearsay testimony may be used to determine whether a preponderance of the evidence favors forfeiture under CAFRA. *$64,495.00 in U.S. Currency*, No. 5:13-CV-265-REW, 2014 WL 5432119, at *3 (E.D. Ky. Oct. 27, 2014).

to the Federal Drug Task Force where he searches for financial information in order to assist with investigations.  (*Id*. at 118:7-15.)

Clark testified that he worked on the Winston case, subpoenaing financial records in connection with an investigation into the sale of marijuana.  (*Id*. at 119:24-120:13.)  During the investigation, a search warrant was executed at Winston's property at 999 Cummington Road.  (*Id*. at 120:14-18.)  Clark and other investigators found and seized financial records, bank records, business cards, and bank statements.  (*Id*. at 120:25-121:1; JE-H.)

In the course of the investigation, Clark discovered that Winston pled guilty to a money laundering charge with regards to his purchase of a 2007 Ford Econoline van on September 18, 2012, which Winston purchased from Too Short Auto Sales, Columbus, Ohio for $6,875.  (*Id*. at 126:9-12.)  Clark also discovered a building permit issued by the City of Columbus Department of Building and Zoning Services for Winston's property at 999 Cummington Road.  (*Id*. at 131:11-13.)  The total estimated cost of the work in the permitting paperwork was $60,000.  (*Id*.; 2-4, P-M.)  The Franklin County Auditor's site lists Winston and his wife, Carma Kelley ("Kelley"), as the owners of the property at 999 Cummington Road.  (*Id*. at 134:14-22; P-O.)  Clark subsequently confirmed their ownership through certified records from the Franklin County Auditor's Office.  (*Id*. at 23-25.)

On cross examination, Clark testified that he did not have any personal knowledge as to whether the $60,000 figure listed on the building permit represents the actual cost or the value of the improvements.  (*Id*. at 146:4-6.)  Clark testified that he is aware Winston has a background in building and construction skills and that he did not know to what extent the work on the property was performed by Winston or an employee of his company.  (*Id*. at 11-15.)  Clark further

testified that he did not have any knowledge of whether Winston, or his then-girlfriend Kelley, paid for any materials or fixtures. Clark acknowledged that no work orders or cost estimates for the proposed improvements were attached to the building permit. (*Id*. at 17-25.)

Claimant recalled Clark as a witness in his case-in-chief on March, 2, 2017. During this testimony, Clark testified that, in his 30 years of experience, he surmised it was "common for drug dealers to use their drug profits to pay for the expenses of their business," as well as to "sometimes devote their profits to expanding their business." (Tr. Vol. 2, 15:13-16:4.) Clark also opined it was "more probable than not that the cost of the warehouse and that equipment [e.g. forklifts] was paid for with drug money." (*Id*. at 16:11-14.)

The Court finds the testimony of Clark credible and accords it appropriate weight.

**7. Brooke Whittaker**

Brooke Whittaker ("Whittaker"), C.P.A., testified that she is an auditor who works for the Department of Justice, United States Attorney's Office primarily with the Civil Division, but occasionally also supporting the Criminal Division. (Tr. Vol. I, 153:23-154:3.) In the course of her employment, Whittaker reviewed financial records for Winston and his personal business, entitled, Winston Hauling, and created charts to summarize his income and expenses. (*Id*. at 154:11-13; P-I.1-P.-I.3.) In the charts, Whittaker depicts a summary of Winston's reported income and estimated expenses for the relevant years of 2009 through 2012.[7] (*Id*. at 155:8-10.)

Whittaker calculated Winston's net wages from his job at a call center, entitled Tek-Collect, using IRS form W-2s for the relevant years. Whittaker also pulled Winston's reported income from his personal business, Winston Hauling, from his tax returns. The total reported income from Tek-Collect and Winston Hauling between 2009 and 2012 was $169,132. (*Id*. at

---

[7] Winston was released from McKean in 2009 and purchased the Property in 2012.

16-25; P-I.1.)  Whittaker also estimated Winston's expenses, using information provided by Winston in his Pre-Sentence Investigation Report ("PSI"), as well as receipts from Winston's financial records depicting spending on jewelry, car loans, and delinquent taxes.  (*Id*. at 156:9-12; P-I.1; P-E; P-G; P-K; P-H; P-L.)

On cross-examination, Whittaker testified that she extrapolated the expenses based on available data, including Winston's PSI in which he reported to the Probation Officer that his estimated monthly expenses were $3000.  Whittaker conceded that she had no personal knowledge whether Winston's reported expenses to the Probation Officer who compiled his PSI were accurate.  (*Id*. at 162:10-18.)  Whittaker further testified that she had access to Winston's Pretrial Services Report, which reported a different sum for estimated expenses that was lower than the estimation in the PSI.  (*Id*. at 163:15-21.)

The Court finds the testimony of Whittaker credible and accords it appropriate weight, with the exception that her testimony regarding Winston's estimated personal expenses from 2009 through 2012 is only partially credible.

## B.    Claimant

Winston presented one witness at trial who testified on March 2, 2017.  The following is a summation of her testimony relevant to the determination of the claim at issue, as well as general credibility determinations.

### 1.    Valerie Banks

Valerie Banks testified that she is Winston's sister.  (Tr. Vol. 2, 3:23-25.)  Banks stated that she is a Project Manager with Nationwide Bank, where she has worked for about two years. Prior to her employment at Nationwide Bank, Banks worked for JP Morgan Chase for about 18

years as an Assistant Vice-President in the Mortgage Division. (*Id*. at 5-15.) Between the years 2009 through 2011, Banks was employed at JP Morgan and her salary at the time was sufficient to cover all of her living expenses. (*Id*. at 12-19.) Banks additionally testified that, after being released from McKean, Winston resided in a halfway house for a period of time before coming to live with Banks in her home for two years beginning in April 2009. (*Id*. at 5:12-6:6.) Banks testified that Winston did not pay rent during this time. (*Id*. at 7:2-5.) According to Banks, Winston took public transportation daily to his job at Collect-Tek. (*Id*. at 22-25.) Banks further testified that Winston was miserly with his money. (*Id*. at 8:11-12.) Winston would occasionally give his sister $100 every five or six months while he lived with her. (*Id*. at 10:17-25.) Banks finally testified that Winston also purchased a Ford Taurus while residing with her for "probably 3,000, 4,000 dollars." (*Id*. at 11:9-11.)

The Court finds the testimony of Banks credible and accords it appropriate weight.

## FINDINGS OF FACT

Based upon the trial testimony and the documentary evidence,[8] the Court makes the following findings of fact, pursuant to Federal Rule of Civil Procedure 52(a).

1. Winston served time in McKean for a previous offense until his release in April 2009.

2. Winston was involved with large-scale trafficking and distribution of marijuana throughout the relevant time period from 2009 through when he purchased the Property in 2012.

   a. Winston paid Johnson approximately $25,000 to rent warehouses that were used in the storage of the marijuana as well as forklifts, and a crane.

---

[8] Joint Exhibits A-N were admitted to the record, subject to cross-examination on JE-H. (Tr. Vol. 1, 9:22-23.) Plaintiff's Exhibits ("PE") P-A, P-C, P-D, P-E, P-F, P-G, P-H, P-I.1, P-I.2, P-I.3, P-K, P-L, P-M, P-N, and P-O were also admitted to the record. (Tr. Vol. 1, 14:11-14, 88:10, 132:9-13; 136:7-11, 158:19-159:4, Tr. Vol. 1, 18:4-5.) P-K and P-L were admitted under seal.

b. Sims and Winston bought and sold marijuana to one another on a number of occasions during the relevant time period.

3. Large-scale trafficking of marijuana in the Columbus area, akin to Winston's during the relevant time period, is highly lucrative.

4. Winston's unrebutted legitimate income from employment at Tek-Collect and from Winston Hauling during the relevant time period was $169,132.

5. Winston's unrebutted expenses during the relevant time period included:

| | |
|---|---|
| Payments to Jared the Galleria of Jewelry | $8,828 |
| Tax Payments | $4,756 |
| Car Payments | $5,856 |
| Warehouse Rentals | $62,091 |
| Payments to Johnson | $25,000 |
| Sept. 2012 Van Purchase | $6,875 |
| Cash payments to Banks | $400 |
| Ford Taurus | $3,000 |
| **Total unrebutted expenditures 2009-2012** | $116,806 |

6. Winston's reported available income after his unrebutted expenses during the relevant time period of 2009 through 2012 totals $52,326 ($169,132 – $116,806 = $52,326); or $13,081.50 per year. ($52,326 / 4 years = $13,081.50)

7. Winston had other expenses during the relevant time period including costs towards a duplex Winston purchased and remodeled; costs associated with remodeling 999 Cummington; and living expenses such as mortgages, utilities, groceries and gas. Winston also made payments for the Property to Adams for which Winston paid at least $26,500.[9]

8. Winston lived in a halfway house upon his release from McKean until April 2009. Thereafter, he lived with Banks for about two years until approximately April 2011. He did not pay rent to Banks during this time, outside of the cash payments reflected in his expenditures above.

9. Winston took public transportation to his job at Tek-Collect for a period of time, at least until he purchased a Ford Taurus.

10. In May 2013, Winston pled guilty, in this Court, to conspiracy to possess with the intent to distribute over 1,000 kilograms of marijuana and money laundering with respect to purchasing the white van with proceeds from the conspiracy.

### III. ANALYSIS & CONCLUSIONS OF LAW

**A. Standard of Review and Import of *Marcy Road* in the Court of Appeals**

CAFRA was passed by Congress to regulate enforcement of the federal civil forfeiture laws. *United States v. Real Property in Section 9*, 241 F.3d 796, 799 (6th Cir. 2001). Specifically, under the prior statutory scheme, once the government demonstrated probable cause that an asset was subject to forfeiture, "the burden shifted to the claimant to prove by a higher

_____

[9] Adams' testimony and the payment ledger he created are ambiguous with respect to whether Winston paid anything towards the remaining $10,000 balance on the purchase price. The Court notes that Adams previously indicated to investigators that Winston had paid the entire contract price, but that Adams did not record it on the ledger. (Verified Compl, Aff. Ryan Marvich, ¶ 23 (ECF No. 1-1.)) Given this conflicting evidence, the Court finds that the Government has only proven by a preponderance that Winston paid $26,500 towards the contract.

standard of evidence – preponderance of the evidence – that forfeiture is not required." *Id*. at 797. Now that CAFRA has been enacted, "the burden of proof is on the Government to establish, *by a preponderance of the evidence*, that the property is subject to forfeiture." *Real Property 10338 Marcy Road*, 659 F. App'x at 215 ("*Marcy Road*") (quoting 18 U.S.C. § 983(c)(1)). Additionally, in cases like this one in which the forfeiture claim is based on a proceeds theory, the government must show that the property in question was purchased with money that had a "substantial connection" to an unauthorized drug sale. *Id*. at 216.

As an initial matter, the Court turns to the effect of the decision of the Court of Appeals for the Sixth Circuit in *Marcy Road*. The Court of Appeals ultimately determined that, viewing all the evidence in the light most favorable to Winston, he had raised a "genuine dispute of fact regarding the government's ability to establish a substantial connection between the proceeds used to purchase the property and any drug trafficking in which Winston engaged." 659 F. App'x at 220. As such, the Court reversed the entry of summary judgment in favor of the Government and remanded the matter for such further proceedings as necessary. *Id*.

To the extent Claimant asserts that this Court is somehow bound by the Court of Appeals' determination regarding the state of the evidence under the law of the case doctrine or otherwise, he is mistaken. "[W]here there is substantially different evidence raised on subsequent trial," the law of the case doctrine permits a district court to revisit even those issues previously decided by a higher court." *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) (internal quotations and citations omitted). At bottom, the Court of Appeals in *Marcy Road* established that the Government must prove a substantial connection between a drug

offense and the subject property[10] and concluded that the conflicting state of the evidence at that stage of the proceeding prohibited entry of summary judgment. Thus, *Marcy Road* clarified the standard and this Court's obligations in this case. Specifically, this Court must determine whether the Government has established by a preponderance of the evidence that the Property was purchased by Winston with cash that had a substantial connection to illegal drug trafficking.

With this in mind, the Court turns to the applicable law. A "substantial connection" can be proven by either direct or circumstantial evidence. *E.g. United States v. Veggacado*, 37 F. App'x 189, 190 (6th Cir. 2002); *United States v. $291,828.00 in U.S. Currency*, 536 F.3d 1234, 1237 (11th Cir. 2008); *U.S. v. $64,495.00 in U.S. Currency*, 2014 WL 5432119, at *7 (using circumstantial evidence to meet the government's burden of proof "can be appropriate under CAFRA"); *see also Marcy Road*, 659 F. App'x at 217 (explaining that arguments the government makes while proffering circumstantial evidence of a substantial connection have "legal and theoretical validity"); *United States v. Seventy Thousand One Hundred Fifty Dollars in United States Currency*, No. 1:02-CV-00874, 2009 WL 3614871, at *9 (S.D. Ohio Oct. 28, 2009) (granting summary judgment in favor of the government where circumstantial evidence demonstrated a substantial connection between the claimant and a financial transaction using money obtained from unlawful activity). Circumstantial evidence, including evidence that a

_____

[10] The forfeiture statutes do not contain language specifically indicating that the "substantial connection" between a drug offense and the subject property required under a "facilitation theory" is also necessary under a "proceeds theory." In *Marcy Road*, the Court resolved this question and found, in this case, "under CAFRA's burden-of-proof provision, 18 U.S.C. § 983(c)(1), the government is required to establish by a preponderance of the evidence that the Marcy Road property was purchased by Winston with cash that had a 'substantial connection' to an unauthorized drug sale." 659 F. App'x at 216.

While this Court is mindful that *Marcy Road* is an unpublished case that carries no general precedential value, the statements of law announced in the decision are binding in this particular case. *Id*. at 216, n.1 (citing *Tanner v. Yukins*, 776 F.3d 434, 441 (6th Cir. 2015)).

18

claimant's available legitimate income was insufficient to purchase the property at issue, can be used to show that proceeds are traceable to illegal activity under the preponderance standard. *See United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658,662 (6thCir. 2003) ("[E]vidence of legitimate income that is insufficient to explain the large amount of properly seized, unrebutted by any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by the statute."). Courts must examine the "totality of the circumstances" in making a determination of a substantial connection. *$64,495 in U.S. Currency*, 2014 WL 5432119, at *3.[11]

## B. The Parties' Arguments

The Government maintains that the evidence adduced at trial paints a different picture of Winston's finances than the evidence before the Court of Appeals at the summary judgment stage in *Marcy Road*. The Government nevertheless renews its arguments made at the summary judgment stage and maintains that Winston's use of cash for the large purchase of the Property,

---

[11] Claimant relies heavily on the standards that apply to the federal criminal forfeiture, particularly with the Government's obligation in criminal forfeiture proceedings to trace the funds and the source of the funds used to purchase the tangible asset. (Clmt's Brief, ECF No. 64 at pp. 3-5, 8-11.) Claimant recognizes that the cases upon which he relies involve tracing under the criminal forfeiture statute, he nevertheless posits that "there is no sound policy for relaxing this requirement in a civil proceeding." (*Id*. at p. 11.) The Court disagrees and finds these cases inapposite.

Criminal forfeiture is part of the sentence—punishment—imposed on a defendant who has been convicted in a criminal case. *See, Libretti v. United States*, 516 U.S. 29, 38–39 (1995) (forfeiture is an element of the sentence imposed following conviction). A criminal forfeiture order is an *in personam* proceeding against a defendant in a criminal case, as distinguished from civil forfeiture which is an *in rem* proceeding brought against the property or thing. *See, e.g., United States v. $405,089.*23, 518 U.S. 267, 282—84 (1996) (discussing, *inter alia*, distinctions between civil and criminal forfeiture statutes for purposes of the double jeopardy clause); *United States v. Bajakajian*, 524 U.S. 321, 330—31 (1998) (discussing origins of theories supporting civil and criminal forfeitures in context of the excessive finds clause). Thus, the standards differ between the burdens the Government carries when it decides to proceed *in personam* or *in rem*.

and a record of active illegal drug trafficking are indications that the Property was acquired with proceeds from drug sales.  The Government argues that is has proved by a preponderance of the evidence that Defendant Real Property at Marcy Road is forfeitable to the United States as proceeds of illegal drug trafficking under 21 U.S.C. § 881(a)(6).

Winston, on the other hand, maintains that the Government has not met its burden in this case.  He insists that the Government assumes he applied all of his legitimate earnings but not of his illegal income to daily living expenses and the purchase of other assets, such as the jewelry.  Winston claims that the evidence shows he had generated sufficient legitimate income to enable him to acquire the Property legally.[12]

## C.  Application of the Law to the Facts

Here, no direct evidence exists and the Government offers circumstantial evidence in favor of forfeiture under CAFRA.  The Government contends that, during the relevant time period between 2009 and 2012, the record reflects Winston had insufficient legitimate income to cover all of his known expenditures, such that proceeds from his unlawful drug activities must

---

[12] Winston argues that the Government has not met its burden because it has not established, among other tracing requirements, how much of the value of the funds came from untainted sources and how much came from tainted sources.  *See generally*, Claimant's Brief, ECF No. 64, at p. 8.  The Court, however, finds this line of authority inapplicable in this case involving civil forfeiture.  Criminal forfeiture and its punitive nature derive from the common law.  "It was only in 1970 that Congress resurrected the English common law of punitive forfeiture to combat organized crime and major drug trafficking.  . . . . In providing for this mode of punishment, which had long been unused in this country, the Senate Judiciary Committee acknowledged that 'criminal forfeiture ... represents an innovative attempt to call on our common law heritage to meet an essentially modern problem.'"  *Bajakajian*, 524 U.S. at 332 (quoting S. Rep. No. 91-617 p. 79 (1969)).  Thus, the requirements for methodical and rigorous tracing all funds in an *in peronam* forfeiture proceeding to determine if Winston should be "punished" for the crime do not apply here.  Instead, the Government must prove by a preponderance of the evidence that the Property was purchased by Winston with cash that had a substantial connection to illegal drug trafficking.

have been used towards his purchase of the Property.  The Government in effect renews its arguments made at the summary judgment stage that use of cash for the large purchase of the Property, and a record of former drug activity are indications that the Property was acquired with proceeds from drug sales.  While acknowledging that both propositions have "legal and theoretical validity," the Sixth Circuit denied their applicability to this case based on the record evidence available at that stage in the case.  *Marcy Road*, 659 F. App'x at 217-218.  Thus, in order to credit these arguments, the Court must find that additional evidence on these points submitted at trial but not previously in the record at the time of summary judgment, now weighs in favor of forfeiture.

The Government is correct in asserting that a lack of legitimate income can be used to demonstrating a substantial connection justifying forfeiture.  *E.g. Marcy Road*, 659 F. App'x at 217 (acknowledging legal validity to the statement that the government "may meet its burden by showing that the claimant's legitimate income is insufficient to explain the large amount of property seizes); *United States v. Carrell*, 252 F.3d 1193, 1201 (6th Cir. 2001) (pre-enactment of CAFRA using more lenient probable cause standard, court found claimant's lack of any legitimate income sufficient to justify forfeiture); *$64,495 in U.S. Currency*, 2014 WL 5432119, at *7 ("an insufficient amount of legitimate income can, in combination with other factors, be inadequate to explain" the existence of significant cash from the claimant thus justifying seizure); *Veggacado*, 37 F. App'x at 190 (noting claimant "had not filed state income tax returns for the previous five years and thus had no apparent income other than from drug trafficking" in upholding forfeiture of jewelry as drug trafficking proceeds).

Winston counters that that the circumstantial evidence is legally and factually insufficient to satisfy the tracing requirements of the civil forfeiture statute. Winston points out that his legitimate income from employment and self-employment for the years 2009 to 2012 of $169,132 well exceeds the $36,500 purchase price for the Property. As such, Winston argues that Government has failed to meet its burden of tracing his illegitimate income to the purchase of the Property in that his legitimate income exceeded the $36,500 purchase price by almost $133,000.

The evidence adduced at trial proves that Winston was actively participating in the illegal drug trafficking conspiracy at the time he paid for the Property. (JE-K, Criminal Statement of Facts). The record shows that Winston paid over $60,000 to Steven Johnson in 2012 for renting warehouses and compensated Johnson $25,000 for his assistance in securing the warehouse space. (P-C and D, US Bank Records.)

The unrebutted evidence also shows that Winston's reported-legitimate income in the relevant period between 2009 and 2012 was $169,132. Winston's undisputed or unrebutted total expenditures during the relevant period totaled $116,806. Winton's available income after his unrebutted expenses, therefore, was $52,326 during the relevant four year period.

The crucial issue thus becomes whether the Government has proven by a preponderance of the evidence that Winston had additional expenses during 2009 through the end of 2012 that would decrease his available-legitimate income to such an extent that it would be mathematically impossible that he purchased the Property without ill-gotten drug proceeds. The Court concludes that the Government has met its burden.

Winston challenges the Government's assumptions regarding the amount of his expenses and contends such assumptions are not supported by the evidence. For instance, Winston faults the Government's summary witness, Brooke Whittaker, for taking the monthly expense figure of $3089 from Winston's PSI and extrapolating it over a 48-month period to arrive at an estimate of his living expenses. (Clmt's Brief, ECF No. 64, at p. 12.) He notes that the Probation Officer's math was incorrect and that Whittaker conceded that the actual expenses should have been $2,762, which would decrease her four-year estimate by $15,969. (*Id*. at 12-13.) She also acknowledged that she had no factual basis for assuming the figure given by Winston during the June 2013 PSI interview reflected his actual expenses in 2009 through 2012. (*Id*. at 13, citing Tr. At PageID 499-500.) Winston also notes that he lived with his sister, Valerie Banks, rent-free from April 2009 through September 2011, which would yield additional savings. Altogether, Winston calculates that Whittaker's estimate of his living expenses during the relevant period of $148,272 (*see* Exh. P-I.1, Estimated Expenses) should be reduced by $57,832 given all of the above-referenced "discrepancies." (*Id*.) Thus, according to Winston's calculations, his living expenses during the four-year period were $90,440. ($147,272 – $57,398 = $90,440.)

Winston's arguments in this regard miss the mark. Winston's unrebutted expenses during the relevant period were $116,806. (Findings of Fact, ¶ 5.[13]) Winston, however, had other expenses during the relevant time period including costs towards a duplex Winston purchased and remodeled when he was released from the halfway house;[14] costs associated with remodeling 999 Cummington; and living expenses such as mortgages, utilities, phone, groceries,

---

[13] These expenses include payments to Jared for jewelry; taxes; car payments; warehouse rentals, payments to Johnson, September 2012 van purchase; payments to Bank; and a Ford Taurus.
[14] The record contains no evidence as to the amount of money Winston invested in this duplex, other than Sims' statement that Winston said he spent his savings from the call-center job to pay for it. Accordingly, the Court does not attribute this as a known expense for Winston.

gas, car maintenance, and a myriad of other typical life expenses. Merely because the Government has not proven each and every expense down to the dollar does not mean that Winston did not incur the expense at all.

The Court finds that Government has proved by a preponderance of the evidence that Winston had significant expenses during 2009 through 2012, in addition to the $116,806 of unrebutted expenses. Adopting Winston's calculation of $90,440 for his living expenses, and associating only 50% of the estimated $60,000 in remodeling costs for the renovation of 999 Cummington,[15] the evidence in the case appears as follows:

| Winston's Legitimate Income | | $169,132 |
|---|---|---|
| Unrebutted Expenses | $116,806 | |
| Remodeling costs | $30,000 | |
| Living Expenses | $90,440 | |
| Total Expenditures | $237,246 | |
| Total Legitimate Income Available After Expenditures | | **($68,114)** |

Thus, Winston had negative available legitimate income at the end of 2012 and therefore could not have purchased the Property without the use of drug proceeds. Given that Winston had insufficient legitimate income, and at the time was engaged in a large-scale drug trafficking scheme, the Court concludes that he purchased the Property with proceeds from his illegal activities. *See United States v. $174,206 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003).

---

[15] The evidence indicates that the $60,000 figure was only an estimate of the costs of the improvements. (ECF No. 62, at PageID483-84.) Also, Winston could have performed some of the work himself, and his girlfriend (now wife) paid at least $5,000 for the cost of some materials. Therefore, the Court charitably attributes only $30,000 to Winston as an estimate for the complete remodel of his home on Cummington.

Because the Government has established by a preponderance of the evidence that the Marcy Road Property was purchased by Winston with cash that had a substantial connection to the unauthorized sale of drugs, and considering the totality of the circumstances, the Court concludes that forfeiture is appropriate.

## IV.    DISPOSITION

The United States has met its burden by showing it is more likely than not that the Defendant Real Property at Marcy Road was purchased with proceeds from illegal drug trafficking activity.  Defendant Real Property is therefore forfeitable to the United States as proceeds of illegal drug trafficking under 21 U.S.C. § 881(a)(6).  The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of Plaintiff, the United States of America.  The Clerk is further **DIRECTED** to remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

Date:  March 30, 2018                        _____/s/ *Elizabeth A. Preston Deavers*
                                             ELIZABETH A. PRESTON DEAVERS
                                             CHIEF UNITED STATES MAGISTRATE JUDGE